1  RON BENDER (SBN 255030)
   KRIKOR J. MESHEFEJIAN (SBN 255030)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, California 90067
   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
4  Email: rb@lnbyb.com; kjm@lnbyb.com

5  Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
(RIVERSIDE DIVISION)**

| In re:<br><br>ALIN PARTY SUPPLY CO.,<br><br>　　Debtor and Debtor in Possession. | Case No. 6:11-bk-25804-WJ<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER APPROVING CASH COLLATERAL STIPULATION AND AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Omnibus Declaration of Dennis Fitzgerald filed concurrently herewith]<br><br>[Emergency Hearing Date To Be Set] |
|---|---|

**TO ALL SECURED CREDITORS, THE TWENTY LARGEST UNSECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), Section 363(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Alin Party Supply Co., the debtor and debtor in possession in the above-entitled Chapter 11 bankruptcy case, hereby moves for entry of an order approving that certain "Stipulation Regarding Use Of Cash Collateral And To Provide Adequate Protection" (the "Stipulation") entered into between the Debtor and its sole secured creditor with an interest in the Debtor's cash collateral, Mark and Dolly Rouse Trust ("Rouse").  A copy of the Stipulation is attached as Exhibit "1" to the Omnibus Declaration of Dennis Fitzgerald (the "Fitzgerald Declaration") and a copy of the Debtor's proposed cash collateral budget is attached as Exhibit "2" to the Fitzgerald Declaration.

The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on May 13, 2011.  The Debtor sells party, special event and banquet supplies through two retail stores located in Riverside, California and Lakewood, California, with corporate headquarters and the Debtor's warehouse located in a single location in Cerritos, California.

Originally founded in 1971 as a small scale family operation, under prior ownership, the Debtor initially expanded to three stores located in Riverside, Downey, and Lakewood, California.  Under current ownership, the Debtor originally expanded its operations to six permanent stores, with four of the stores located in Southern California, and two of the stores located in Oregon.  The Debtor was consistently profitable every year since current ownership acquired the Debtor, until approximately 2008, when sales revenues began to steadily decrease as a result of the most significant economic recession ever experienced by the Debtor.

The Debtor began to experience a significant reduction in sales starting in 2008, and attempted to address the problem by reducing its work force.  However, sales continued to decline

through 2010, and the cost-cutting measures implemented by the Debtor were not sufficient to counteract declining revenues. In 2007, the Debtor realized net income of $199,977; in 2008, the Debtor experienced a net loss of $282,317; in 2009, the Debtor experienced a net loss of $123,556; and in 2010, the Debtor experienced a net loss of $1,719,349. Essentially, people are spending less, and buying less often, than ever before in the recent past, and the substantial increase in losses which the Debtor experienced between 2009 and 2010 were too large to overcome.

By the end of October 2010, as a result of significant underperformance of eight seasonal temporary stores opened by the Debtor in connection with Halloween as well as the underperformance of the Debtor's permanent stores, it became obvious to the Debtor that unless a significant financial restructuring action was quickly implemented, the Debtor would run out of cash and be unable to continue operating its business.[1] Adding to the Debtor's cash flow crisis was the fact that, in November 2010, Gateway Business Bank, which had extended a secured line of credit to the Debtor in the total amount of $1.4 million (which has been fully repaid), declined to renew that line of credit. In April 2011, the Debtor again approached Gateway Business Bank for a line of credit but the Debtor was unable to obtain credit on workable terms. The Debtor was therefore left without a credit facility to enable the Debtor to borrow additional cash to cover budget shortfalls.

Accordingly, the Debtor implemented aggressive restructuring measures. The Debtor entered into an agreement with Cross Technologies, Inc. as a restructuring consultant to the Debtor, to assist the Debtor with a restructuring plan and negotiations with creditors, and the Debtor retained the services of Great American Group, LLC as liquidating agent for the Debtor in order to close and liquidate the Debtor's underperforming stores.

Between November 2010 and January 2011, the Debtor closed and liquidated four of its stores, located in Beaverton, Oregon, Salem, Oregon, Covina, California, and Downey,

---

[1] For instance, by the end of September 2010, the Debtor's temporary store locations were 24% behind their projected budget, and for the month of October 2010 alone, the Debtor received $709,000 less revenue from both its permanent and temporary stores than it had projected.

3

California.  The Debtor has closed such stores, returned possession of such premises to the respective landlords, and removed any and all of its personal property from such store locations.  The Debtor is currently operating two retail stores located in Riverside and Lakewood, California.

The Debtor's efforts to negotiate resolutions of creditors' and landlords' claims in connection with such restructuring efforts was generally successful, as the Debtor was able to secure tentative settlements with most of its vendors, including all of the Debtor's major accounts.  However, the Debtor was unable to secure settlements from a majority of its landlords for the closed stores which thwarted the Debtor's ability to effectuate an out-of-court restructuring.

As a result of the significant decrease in the Debtor's revenues, Gateway Business Bank's decision not to renew the Debtor's line of credit, the unexpected filing of a class action lawsuit against the Debtor in March 2011, and the Debtor's inability to obtain the consent of landlords to an out-of-court restructuring, and after significant consideration of all of the Debtor's options, with input from the Debtor's restructuring advisors, the Debtor determined that it is in the best interests of the Debtor's estate to file for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Accordingly, the Debtor filed for bankruptcy to preserve and maximize the Debtor's estate for the benefit of the Debtor's creditors, to provide the Debtor a reprieve from creditor demands, and actual and potential litigation, and to provide the Debtor an opportunity to reorganize its financial affairs in as efficient a manner as possible.

As discussed above, the Debtor previously utilized a secured line of credit with Gateway Business Bank which has been paid in full.  The Debtor and Gateway were unable to agree upon terms for the renewal of that line of credit after Gateway initially declined to renew that line of credit on existing terms and conditions), and the Debtor was unable to find an alternative source of credit until very recently.

Specifically, on or about April 29, 2011, the Debtor and Rouse entered into that certain Promissory Note and Security Agreement, whereby the Debtor has borrowed $250,000 on a secured basis, at a 12% annual rate of interest (the "Loan").  The Debtor obtained the Loan for the purpose of ensuring that it would be capable of addressing any budget shortfalls which may arise

on a going forward basis. The Loan matures on April 30, 2012, and the Debtor is required to make monthly interest payments on the Loan commencing on June 1, 2011. The Loan is secured by all of the Debtor's personal property, including the Debtor's cash collateral. Rouse consents to the Debtor's use of cash collateral.

Specifically, the Debtor's seeks to use cash collateral pursuant to the terms and conditions outlined in the cash collateral stipulation (the "<u>Stipulation</u>") which is attached as Exhibit "1" to the Fitzgerald Declaration. The Debtor believes that the terms of the Stipulation are reasonable and appropriate under the circumstances. The terms and conditions of the Stipulation are relatively straightforward, and are based upon the terms and conditions provided in the Loan documents. Specifically, the Promissory Note evidencing the Loan provides that "Lender hereby consents to Borrower's use of cash Collateral, both prior to and during any Chapter 11 bankruptcy case, to pay any and all expenses incurred by Borrower in the ordinary course of Borrower's business." The Promissory Note is attached as Exhibit A to the Stipulation. While the Stipulation provides the Debtor with blanket authority to use cash collateral for all expenses incurred by the Debtor in the ordinary course of the Debtor's business, with no specific budget requirements, the Debtor has nevertheless submitted its anticipated cash flow for the period of May 14, 2011 through July 8, 2011 by way of the budget attached as Exhibit "2" to the Fitzgerald Declaration.

The Promissory Note also provides that "Borrower shall pay simple interest on the unpaid principal balance monthly on the first day of each calendar month, commencing June 1, 2011." The Debtor seeks Court approval of the stipulation which simply reaffirms the terms and conditions existing in the Promissory Note and authorizes the Debtor to make monthly interest payments to Rouse in accordance with the terms of the Promissory Note. Because the first such payment is due on June 1, 2011, the Debtor respectfully requests that the Court hold a hearing on this Motion in advance of June 1, 2011.

Based on the foregoing, and because Rouse has consented to the use of cash collateral pursuant to the terms of the Stipulation, the Debtor respectfully submits that the requirements of

11 U.S.C. § 363(c)(2)(A) have been satisfied as to Rouse. To the Debtor's knowledge, no other party has, or can assert, a security interest in the Debtor's cash.

The relief sought in this Motion is based upon this Motion, the annexed Memorandum of Points and Authorities and the declarations and exhibits thereto submitted in support of this Motion, the statements, arguments and representations of counsel to be made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

In order to provide maximum notice of this Motion, the Debtor will serve a copy of this Motion and all supportive papers (including notice of the hearing) via overnight mail upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the twenty largest unsecured creditors, and those parties who have requested special notice, such that they are received, at the latest, on May 14, 2011.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(a)    affirming the adequacy of the notice given;

(b)    approving the Stipulation and authorizing the Debtor to use cash collateral pursuant to the terms of the Stipulation; and

(c)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: May 13, 2011    ALIN PARTY SUPPLY CO.

By:    */s/ Krikor J. Meshefejian*
RON BENDER
KRIKOR J. MESHEFEJIAN
LEVENE, NEALE, BENDER,
YOO & BRILL L.L.P.
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

# STATEMENT OF FACTS

## A. BACKGROUND INFORMATION AND EVENTS LEADING TO BANKRUPTCY.

1. On May 13, 2011 (the "Petition Date"), Alin Party Supply Co. (the "Debtor") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtor continues to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. The Debtor is in the business of selling party, special event and banquet supplies through two stores owned by the Debtor which are located in Riverside and Lakewood, California, under the names "Alin Party Supply" and "Alin Party Superstore."[2] The Debtor's merchandise ranges from party and event goods for themes such as weddings, birthdays, baby showers, graduations, to seasonal items for every holiday or occasion (such as Halloween, when the Debtor sells Halloween costumes, gifts, candy, etc.). From time to time, the Debtor also enters into leases for temporary Halloween store locations, with such leases typically for a period of three months ranging from around August 15 through around November 15.

3. Each of the Debtor's permanent stores is stocked with about 114,000 regular, seasonal and special items throughout the year. Items include: novelties, decorations, tableware, banquet supplies, life-size stand ups, toys and party favors, wrap and ribbons, stationary and greeting cards, and balloons. The Debtor uses hundreds of merchandise sources, stays on top of trends and has superb relationships with long-time major suppliers which the Debtor believes will support its reorganization efforts. While a large variety of retailers, including grocery stores, gift stores, card stores, department stores and drug stores, may offer some of the types of products offered by the Debtor, the Debtor does not have a true competitor in its market that combines the Debtor's store sizes and product offerings in a single package.

---

[2] The Debtor has also operated under the names "Alin's Party Depot" and "Party Depot."

4. Originally founded in 1971 as a small scale family operation, under prior ownership, the Debtor initially expanded to three stores located in Riverside, Downey and Lakewood, California. In 1988, Dennis Fitzgerald and Bernard E. Lyons, Sr. purchased the Debtor, with each obtaining a 50% ownership interest in the Debtor. Dennis Fitzgerald transferred his ownership to his family trust in 1993.

5. In 1998, Mr. Lyons' ownership interest in the Debtor was split three ways, such that the current c-corporation ownership structure of the Debtor is as follows: The Fitzgerald Family Trust dated 9/8/93 owns 50% of the common stock of the Debtor; the Bernard E. Lyons Jr. Living Trust dated December 29, 1999 owns 16.67% of the Debtor; the Mary T. Lane Living Trust dated May 5, 2000 owns 16.67% of the Debtor; and the Daniel E. Lyons Trust dated August 21, 1995 owns 16.66% of the Debtor. Dennis Fitzgerald and Bernard E. Lyons, Jr. are co-Chief Executive Officers of the Debtor, and Andrew Richman is the President of the Debtor.

6. Under current ownership, the Debtor originally expanded its operations to six permanent stores, with four of the stores located in Southern California and two of the stores located in Oregon. The Debtor was consistently profitable every year since current ownership acquired the Debtor, until approximately 2008, when sales revenues began to steadily decrease as a result of the most significant economic recession ever experienced by the Debtor.

7. The Debtor began to experience a significant reduction in sales starting in 2008, and attempted to address the problem by reducing its office and warehouse work force starting in 2008, and reducing store employee work hours starting in 2009. However, sales continued to decline through 2010, and the cost-cutting measures implemented by the Debtor were not sufficient to counteract declining revenues. In 2007, the Debtor realized net income of $199,977; in 2008, the Debtor experienced a net loss of $282,317; in 2009, the Debtor experienced a net loss of $123,556; and in 2010, the Debtor experienced a net loss of $1,719,349. Essentially, people are spending less, and buying less often, than ever before in the recent past, and the substantial increase in losses which the Debtor experienced between 2009 and 2010 were too large to overcome.

8. By the end of October 2010, as a result of significant underperformance of eight seasonal temporary stores opened by the Debtor in connection with Halloween as well as the underperformance of the Debtor's permanent stores, it became clear to the Debtor that unless a significant financial restructuring was quickly implemented, the Debtor would run out of cash and be unable to continue operating its business.[3] Adding to the Debtor's cash flow crisis was the fact that, in November 2010, Gateway Business Bank, which had extended a secured line of credit to the Debtor in the total amount of $1.4 million (which has been fully repaid), declined to renew that line of credit. In April 2011, the Debtor again approached Gateway Business Bank for a line of credit but the Debtor was unable to obtain credit on workable terms. The Debtor was therefore left without a credit facility to enable the Debtor to borrow additional cash to cover budget shortfalls.

9. Accordingly, the Debtor implemented aggressive restructuring measures. The Debtor entered into an agreement with Cross Technologies, Inc. as a restructuring consultant to the Debtor, to assist the Debtor with a restructuring plan and negotiations with creditors, and the Debtor retained the services of Great American Group, LLC as liquidating agent for the Debtor in order to close and liquidate the Debtor's underperforming stores.

10. Between November 2010 and January 2011, the Debtor closed and liquidated four of its stores, located in Beaverton, Oregon; Salem, Oregon; Covina, California; and Downey, California. The Debtor has closed such stores, returned possession of such premises to the respective landlords, and removed any and all of its personal property from such store locations.

11. The Debtor's efforts to negotiate resolutions of creditors' and landlords' claims in connection with such restructuring efforts was generally successful, as the Debtor was able to secure tentative settlements with most of its vendors, including all of the Debtor's major accounts. However, the Debtor was unable to secure settlements from a majority of its landlords for the closed stores, which thwarted the Debtors' ability to effectuate an out-of-court restructuring.

---

[3] For instance, by the end of September 2010, the Debtor's temporary store locations were 24% behind their projected budget, and for the month of October 2010 alone, the Debtor received $709,000 less revenue from both its permanent and temporary stores than it had projected.

12.     As a result of the significant decrease in the Debtor's revenues, Gateway Business Bank's decision not to renew the Debtor's line of credit, the unexpected filing of a class action lawsuit against the Debtor in March 2011, and the Debtor's inability to obtain the consent of landlords to an out-of-court restructuring, and after significant consideration of all of the Debtor's options with input from the Debtor's restructuring advisors, the Debtor determined that it is in the best interests of the Debtor's estate to file for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Accordingly, the Debtor filed for bankruptcy to preserve and maximize the Debtor's estate for the benefit of the Debtor's creditors, to provide the Debtor a reprieve from creditor demands and actual and potential litigation, and to provide the Debtor an opportunity to reorganize its financial affairs in as efficient a manner as possible.

**B.    THE DEBTOR'S DEBT STRUCTURE AND PRIMARY ASSETS AND LIABILITIES.**

13.     As discussed above, the Debtor previously utilized a secured line of credit with Gateway Business Bank which has been paid in full.  The Debtor and Gateway were unable to agree upon terms for the renewal of that line of credit after Gateway initially declined to renew that line of credit on existing terms and conditions, and the Debtor was unable to find an alternative source of credit until very recently.  Specifically, on or about April 29, 2011, the Debtor and the Mark and Dolly Rouse Trust ("Rouse") entered into that certain Promissory Note and Security Agreement, whereby the Debtor has borrowed $250,000 on a secured basis, at a 12% annual rate of interest (the "Loan").  The Debtor obtained the Loan for the purpose of ensuring that it would be capable of addressing any budget shortfalls which may arise on a going forward basis.  The Loan matures on April 30, 2012, and the Debtor is required to make monthly interest payments on the Loan commencing on June 1, 2011.  The Loan is secured by all of the Debtor's personal property, including the Debtor's cash collateral.  Rouse consents to the Debtor's use of cash collateral, and the Debtor has filed a motion seeking Court approval of the Debtor's cash collateral stipulation with Rouse.

14.     A majority of the Debtor's debt consists of approximately $2.4 million of trade debt, as well as potential lease rejection claims which may arise in connection with the Debtor's closed stores.  There are also certain litigation claims pending against the Debtor.

15.     The Debtor's primary assets consist of personal property which includes the Debtor's cash on hand estimated to be approximately $1.5 million; inventory with a book value of approximately $1.4 million (as of March 31, 2011); accounts receivable with a book value of approximately $20,000 (as of March 31, 2011); and store fixtures, machinery and equipment with a book value of $240,000 (as of March 31, 2011)**.**

### C.     THE DEBTOR'S CURRENT OPERATIONS AND REORGANIZATION GOALS.

16.     As a result of the Debtor's store closures which commenced in November 2010, the Debtor currently owns and operates two stores located in Riverside and Lakewood, California pursuant to real property lease agreements.  The Debtor also leases approximately 20,000 square feet of space in Cerritos, California, which space constitutes the Debtor's corporate headquarters and warehouse.  The Debtor will continue utilizing its current corporate space and warehouse through and including May 31, 2011.  As a part of its ongoing cost reduction measures, the Debtor has entered into a lease agreement for approximately 8,193 square feet of space located at 16308 Arthur Street, Cerritos, California to which the Debtor will relocate is corporate headquarters.  Monthly rent at this new location will be approximately $5,000 per month as compared to approximately $14,000 per month which the Debtor is currently paying. Additionally, pre-petition, the Debtor negotiated and entered into a long-term supply contract for party goods with Amscan, Inc., which has historically been one of the Debtor's largest suppliers of party goods.

17.     The Debtor will also likely enter into temporary store leases in connection with the upcoming Halloween sale season.  The Debtor will likely utilize four temporary store locations this year, and, in connection with the opening of such temporary stores, the Debtor has entered into a lease agreement for one store, and expects to enter into three more lease agreements.

18. To help facilitate its reorganization efforts, the Debtor continues to implement cost cutting measures. The Debtor is taking a carefully tailored approach in connection with opening temporary store locations to supplement the Debtor's revenues at its two remaining permanent stores. The Debtor's primary goal is to reestablish the profit margins the Debtor enjoyed through much of its history and propose an exit strategy in this case as soon as practicable. The Debtor does not believe this will happen overnight, but the Debtor does believe that it can reduce losses to manageable levels, and ultimately eliminate such losses altogether as the economy improves and the Debtor's costs are reduced. The Debtor believes that it has a viable business that can and should be able to successfully reorganize. The Debtors intends to propose a plan of reorganization in the very near future.

**D. THE CASH COLLATERAL STIPULATION WITH ROUSE AND THE DEBTOR'S NEED TO USE CASH COLLATERAL.**

19. The Debtor's seeks to use cash collateral pursuant to the terms and conditions outlined in the cash collateral stipulation (the "Stipulation") which is attached as Exhibit "1" to the Declaration of Dennis Fitzgerald filed concurrently herewith (the "Fitzgerald Declaration"). Pursuant to this Motion, the Debtor seeks Court approval of the Stipulation. The Debtor believes that the terms of the Stipulation are reasonable and appropriate under the circumstances. The terms and conditions of the Stipulation are relatively straighforward, and are based upon the terms and conditions provided in the Loan documents. Specifically, the Promissory Note evidencing the Loan provides that "Lender hereby consents to Borrower's use of cash Collateral, both prior to and during any Chapter 11 bankruptcy case, to pay any and all expenses incurred by Borrower in the ordinary course of Borrower's business." The Promissory Note also provides that "Borrower shall pay simple interest on the unpaid principal balance monthly on the first day of each calendar month, commencing June 1, 2011."

20. While the Stipulation provides the Debtor with blanket authority to use cash collateral for all expenses incurred by the Debtor in the ordinary course of the Debtor's business, with no specific budget requirements, the Debtor has submitted its anticipated cash flow for the

period of May 13, 2011 through July 8, 2011 by way of the budget attached as Exhibit "2" to the Fitzgerald Declaration.

21. Pursuant to the terms of the Stipulation, the Debtor seeks to make its monthly interest payments to Rouse. The Debtor's failure to make such interest payments will cause, under the Promissory Note, interest to accrue on any principal due under the note and to the extent permitted by law, on any interest which has not been paid on the date on which it is payable. Because the Loan is clearly oversecured (it is a $250,000 loan secured by all of the Debtor's assets which are otherwise not encumbered), it would not make financial sense for the Debtor to cease making payments on the Loan during the Debtor's Chapter 11 case.

22. Based on the foregoing, and because Rouse has consented to the use of cash collateral pursuant to the terms of the Stipulation, the Debtor respectfully submits that the requirements of 11 U.S.C. § 363(c)(2)(A) have been satisfied as to Rouse. The Debtor is not aware of any other party which may assert a security interest in the Debtor's cash.

Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtor submits that the Stipulation does not contain the following provisions:

| **Provision** | **Paragraph** |
|---|---|
| Cross-collateralization clauses | None |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | None |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | None |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | None |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | None |

| **Provision** | **Paragraph** |
|---|---|
| | |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | None |
| Waivers of avoidance actions arising under the Bankruptcy Code. | None |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | None |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | None |
| Provisions that prime any secured lien | None |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | None |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | None |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | None |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | None |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | None |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | None |
| Findings of fact on matters extraneous to the approval process. | None |

## II.

## DISCUSSION

**A.  The Debtor Should Be Authorized To Use Cash Collateral Pursuant To The Terms Of The Stipulation.**

*1.  Rouse Has Consented To The Debtor's Use Of Rouse's Cash Collateral.*

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)  each entity that has an interest in such cash collateral consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Indus. Partners</u>, 129 B.R. 614 (9th Cir. BAP 1991).

For all of the reasons discussed herein, the Debtor has no ability to continue to manage this bankruptcy estate and maximize the value of the assets of this estate unless the Debtor has the ability to use its cash collateral. The Debtor and Rouse which is the only creditor of the Debtor that has or asserts a security interest in the Debtor's cash have entered into the Stipulation pursuant to which Rouse consents to the Debtor's use of cash collateral. As a result, subject to the approval of the Stipulation by the Court, the Debtor will have the ability to use cash collateral to pay its expenses, as well as monthly interest payments to Rouse on account of the Loan, as evidenced by the budget attached as Exhibit "2" to the Fitzgerald Declaration.

**B.    The Procedural Requirements Regarding Approval Of This Motion Have Been Satisfied.**

Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtor is required to serve a copy of this Motion on any entity with an interest in the Debtor's cash collateral, the 20 largest unsecured creditors, and any other entity that the Court directs. The Debtor has complied with the foregoing by serving a copy of this Motion by email, facsimile, and/or overnight mail on all known secured creditors, the 20 largest unsecured creditors, the United States Trustee, and parties requesting special notice in the Debtor's bankruptcy case.

**III.**

**CONCLUSION**

Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an order:

1.    affirming the adequacy of the notice given;

2.    approving the Stipulation and authorizing the Debtor to use cash collateral pursuant to the terms of the Stipulation; and

3.  granting such other and further relief as the Court deems just and proper under the circumstances of this case.

Dated: May 13, 2011               ALIN PARTY SUPPLY CO.

By: */s/ Krikor J. Meshefejian*
       RON BENDER
       KRIKOR J. MESHEFEJIAN
       LEVENE, NEALE, BENDER,
       YOO & BRILL L.L.P.
       Proposed Attorneys for Chapter 11
       Debtor and Debtor in Possession